1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SERGEY SPITSYN,

            Plaintiff,

      v.

RICHARD MORGAN, *et al*.,

            Defendants.

Case No.  C04-5134FDB-KLS

REPORT AND
RECOMMENDATION

Noted for February 22, 2008

This matter has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B) and Local Magistrates' Rules MJR 1, MJR 3, and MJR 4.  This matter comes before the Court on defendants' motion for summary judgment. (Dkt. #180).  Having reviewed defendants' motion, plaintiff's response that motion (Dkt. #182), defendants' reply thereto (Dkt. #183), and the remaining record, the undersigned submits the following report and recommendation for the Honorable Franklin D. Burgess' review.

FACTUAL AND PROCEDURAL BACKGROUND

This case involves a civil rights action under 42 U.S.C. § 1983 filed by plaintiff against defendants for violation of his constitutional rights.  Plaintiff is a Washington state prisoner and defendants, at least during all times relevant to this matter, were employees or officials of the Washington State Department of Corrections ("DOC").  Plaintiff alleges defendants violated both his First Amendment and Fourteenth Amendment due process rights, by withholding for a period of seven months – between May 2002 and December 2002 –  mail that had been sent to him from his mother and grandmother, which was written in

REPORT AND RECOMMENDATION
Page - 1

1   the Russian language. (See Dkt. #79).

2       Plaintiff further alleges defendants violated his Eighth Amendment right to be free from cruel and

3   unusual punishment after having been sprayed with "pepper gas," and then placed in an air-conditioned

4   cell in October 2002, without any clothes or bedding, and without first being able to wash off the effects

5   of the pepper gas. (Id. at p. 3D). Plaintiff also claims that between November 17, 2004, and March 2005,

6   he was placed in segregation in retaliation for exercising his First Amendment rights by filing this action,

7   and in violation of his Fourteenth Amendment due process rights. Finally, plaintiff claims that one of the

8   named defendants placed in a situation that resulted in a fight with another inmate, again in retaliation for

9   filing this lawsuit, and in violation of his Eighth Amendment and Fourteenth Amendment due process

10  rights. Plaintiff seeks both compensatory damages and court-related costs.

11      Defendants argue in their motion that plaintiff has failed to establish a genuine issue of material

12  fact as to any of the above constitutional claims, and thus that they are entitled to judgment as a matter of

13  law. Plaintiff has filed a response to defendants' motion, and defendants have filed a reply thereto. As

14  such, defendants' motion is now ripe for consideration. For the reasons set forth below, the undersigned

15  agrees with defendants that plaintiff has failed to establish a genuine issue of material fact as to any of his

16  constitutional claims, and therefore that they are entitled to judgment as a matter of law. Accordingly, the

17  undersigned recommends the Court grant defendants' motion.

18                                DISCUSSION

19      Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show there is no

20  genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

21  Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(c). In deciding whether summary judgment should

22  be granted, the Court must view the record in the light most favorable to the nonmoving party and indulge

23  all inferences favorable to that party. Fed. R. Civ. P. 56(c) and (e). When a summary judgment motion is

24  supported as provided in Fed. R. Civ. P. 56, an adverse party may not rest upon the mere allegations or

25  denials of his pleading, but that party's response, by affidavits or as otherwise provided in Fed. R. Civ. P.

26  56, must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e). If the

27  nonmoving party does not so respond, summary judgment, if appropriate, shall be rendered against that

28  party. Id.

1      The moving party must demonstrate the absence of a genuine issue of fact for trial.  Anderson v.

2  Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  Mere disagreement or the bald assertion that a genuine

3  issue of material fact exists does not preclude summary judgment.  California Architectural Building

4  Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).  A "material" fact is one

5  which is "relevant to an element of a claim or defense and whose existence might affect the outcome of

6  the suit," and the materiality of which is "determined by the substantive law governing the claim." T.W.

7  Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

8      Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of

9  summary judgment." Id.  Rather, the nonmoving party "must produce at least some 'significant probative

10  evidence tending to support the complaint.'" Id. (quoting Anderson, 477 U.S. at 290); see also California

11  Architectural Building Products, Inc., 818 F.2d at 1468 ("No longer can it be argued that any

12  disagreement about a material issue of fact precludes the use of summary judgment.").  In other words,

13  the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer

14  with conclusory allegations of an affidavit." Lujan v. National Wildlife Federation, 497 U.S. 871, 888

15  (1990); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (party opposing summary judgment motion must

16  go beyond pleadings and designate specific facts showing presence of genuine issue for trial).

17  I.    Standard of Review in Section 1983 Actions

18      To state a claim under 42 U.S.C. § 1983, a complaint must allege: (i) the conduct complained of

19  was committed by a person acting under color of state law, and (ii) the conduct deprived a person of a

20  right, privilege, or immunity secured by the Constitution or laws of the United States.  Parratt v. Taylor,

21  451 U.S. 527, 535 (1981), overruled on other grounds, Daniels v. Williams, 474 U.S. 327 (1986).  Section

22  1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present.

23  Haygood v. Younger, 769 F.2d 1350, 1354 (9th Cir. 1985).

24      Plaintiff also must allege facts showing how individually named defendants caused or personally

25  participated in causing the harm alleged in the complaint.  Arnold v. IBM, 637 F.2d 1350, 1355 (9th Cir.

26  1981).  A person will be held to deprive another "of a constitutional right, within the meaning of section

27  1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act

28  which he is legally required to do that *causes* the deprivation of which [the plaintiff complains]." Leer v.

1   Murphy, 844 F.2d 628, 633 (9th Cir. 1988) (emphasis in original) (citation omitted).  The Court's inquiry

2   "must be individualized and focus on the duties and responsibilities of each individual defendant whose

3   acts or omissions are alleged to have caused a constitutional deprivation." Id.

4          A defendant, furthermore, cannot be held liable under 42 U.S.C. § 1983 solely on the basis of

5   supervisory responsibility or position.  Monell v. New York City Dept. of Social Services, 436 U.S. 658,

6   694 n.58 (1978).  A theory of *respondeat superior* thus is not sufficient to state a section 1983 claim.

7   Padway v. Palches, 665 F.2d 965, 968 (9th Cir. 1982).

8   II.   Withholding of Plaintiff's Mail

9          Plaintiff claims in his complaint that between May and December 2002, while he was incarcerated

10   at the Washington State Penitentiary ("WSP"), located in Walla Walla, Washington, 25 pieces of his mail

11   from his mother and grandmother were withheld because they were written in the Russian language.  This

12   was done, plaintiff asserts, under the authority or supervision of defendant Steve Fleenor.  Plaintiff further

13   asserts he submitted appeals to defendant Richard Morgan, the Superintendent of WSP at the time, and to

14   defendant Al Scamahorn, Associate Superintendent, but they did not respond or timely respond thereto.

15   Plaintiff also asserts he then timely appealed to defendant Marge Litterell, the Southeast Regional

16   Administrator for the DOC, and Joseph Lehman, the DOC's Secretary at the time, but they did not fairly

17   review or address those appeals.  Lastly, plaintiff alleges defendant D. Snively, the grievance coordinator

18   at WSP, rejected the grievances he filed with respect to the above actions.

19          A.   Plaintiff's First Amendment Claim

20          Prisoners in general do "have 'a First Amendment right to send and receive mail.'" Witherow v.

21   Crawford, 468 F.Supp.2d 1253, 1267 (D. Nev. 2006) (quoting Witherow v. Paff, 52 F.3d 264, 265 (9th

22   Cir. 1995).  That right, however, "must be balanced with the discretion afforded to prison administrators

23   to govern the order and security of the prison." Id. (citing Thornburgh v. Abbott, 490 U.S. 401, 407-08

24   (1989)).  Prison officials thus "may justifiably censor outgoing mail concerning escape plans, information

25   about proposed criminal activity, or transmittal of encoded messages." Id. (citing Procunier v. Martinez,

26   416 U.S. 396, 413 (1974)).  They "have more leeway regarding incoming mail due to greater security

27   risks inherent in materials coming into a prison." Id. (citing Thornburgh, 490 at 413).  As such,

28   restrictions on incoming mail are  valid if they are "'reasonably related to legitimate penological

1   interests.'" Id. (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

2        To determine "the reasonableness" of the prison action at issue, there are four factors, known as

3   the Turner factors, that are relevant to consider. Turner, 482 U.S. at 89.  "First, there must be a 'valid,

4   rational connection'" between the challenged action and "the legitimate governmental interest put

5   forward to justify it." Id. (citation omitted).  The second Turner factor "is whether there are alternate

6   means of exercising the right that remain open to prison inmates." Turner, 482 U.S. at 90.  The third

7   Turner factor "is the impact accommodation of the asserted constitutional right will have on guards and

8   other inmates, and on the allocation of prison resources generally." Id.  Under the fourth Turner factor,

9   "the absence of ready alternatives is evidence of the reasonableness of" the prison action. Id.

10                    1.      The First *Turner* Factor

11        As noted above, "there must be a 'valid, rational connection'" between the challenged action and

12  "the legitimate governmental interest put forward to justify it." Turner, 482 U.S. at 89 (citation omitted).

13  The action "cannot be sustained where the logical connection" between it and "the asserted goal is so

14  remote as to render the policy arbitrary or irrational." Id. at 89-90.  The governmental objective or interest

15  also "must be a legitimate and neutral one." Id. at 90.  That is, the particular action at issue must operate

16  "in a neutral fashion, without regard to the content of the expression." Id.

17        With respect to "neutrality", that term "was intended" by the Supreme Court "to go no further

18  than" require that the practice in question "further an important or substantial governmental interest

19  unrelated to the suppression of expression." Thornburgh, 490 at 415.  Where "prison administrators draw

20  distinctions between" types of incoming mail "solely on the basis of their potential implications for prison

21  security," therefore, the practice is deemed to be "neutral". Id. at 415-16 (goal of protecting prison

22  security central to all other corrections goals).

23        At issue here is the application by defendants of the DOC's mail inspection policy to the 25 letters

24  plaintiff alleges his mother and grandmother sent him between May and December 2002.  While plaintiff

25  claims in his response to defendants' motion that the DOC's mail policy "provides no solution for mail in

26  a foreign language" and leaves DOC staff "clueless on what they should do when they seek a translator,"

27  and alleges therein that defendant Lehman "failed to create a constitutional policy," he included none of

28  these assertions in his complaint. (Dkt. #182, pp. 7-8; see also Dkt. #79, pp. 3-3D).  Accordingly, because

1   plaintiff makes no challenge to the validity of the DOC's mail policy itself in his complaint, that is not an

2   issue for consideration here.

3          The DOC mail policy is important in this case, however, because both parties agree it governed

4   the actions defendants allegedly took or did not take, as the case may be, in handling the mail sent to

5   plaintiff by his mother and grandmother during the relevant time period.  The regulations governing the

6   inspection of inmate mail in place at the time expressly state in relevant part that their purpose was "to

7   maintain the safety, security and discipline of . . . prisons . . . by establishing guidelines for the

8   development of . . . policies and rule governing the receipt . . . of mail by inmates to prevent the

9   transmission of illegal items or contraband into or out of an institution." WAC 137-48-010 (2002).

10          The regulations further provided that "[a]ll mail intended for . . . an inmate, excluding legal mail"

11   could be inspected at any time by the superintendent or his/her designee(s)." WAC 137-48-030(1) (2002).

12   In addition, "[i]ncoming mail to inmates" could be "disapproved for receipt" if the mail was "in a foreign

13   language," its contents were "not understood by the reader," and attempts to interpret the mail had been

14   "unsuccessful". WAC 137-28-040(1)(h) (2002).  The secretary of the DOC also was given the authority

15   to "adopt rules and regulations implementing" WAC Chapter 137-48. WAC 137-48-090 (2002).

16          During the time period in question in this case, also in place was DOC Policy 450.100 ("MAIL

17   FOR OFFENDERS"). (Dkt. #180-2, Exhibit 1, Attachment A).[1]  That policy authorizes "[d]esignated

18   facility staff . . . to inspect and read" incoming mail "to prevent offenders from receiving . . . contraband,

19   or any other material that threatens to undermine the security and order of the facility," and to "prevent

20   criminal activity." (Id. at p. 4).  It further provides that incoming inmate mail "will not be allowed," if the

21   mail is "in a foreign language with contents not understood by the inspecting staff, and reasonable efforts

22   to have the mail interpreted have been unsuccessful." (Id., Attachment A, Attachment 1 ("Unauthorized

23   Mail") to DOC Policy 450.100, p. 1).

24          Preventing criminal activity and maintaining prison security "are legitimate penological interests

25   which justify the regulation of . . . incoming . . . prisoner mail." O'Keefe v. Van Boening, 82 F.3d 322,

26   326 (9th Cir. 1996); Witherow , 52 F.3d at 265 (quoting Martinez, 416 U.S. at 413).  Indeed, as noted

27

28          [1]The DOC Policy 450.100 provided by defendants has an effective date of January 22, 2007, but none of the changes made
       to that policy since 2002, appear to directly affect those provisions relating to the restriction of mail written in a foreign language.
       (See Dkt. #180-2, Exhibit 1, p. 2, Attachment A, p. 1).

REPORT AND RECOMMENDATION
Page - 6

above, "protecting prison security . . . is 'central to all other corrections goals.'" <u>Thornburgh</u>, 490 U.S. at

415 (quoting <u>Pell v. Procunier</u>, 417 U.S. 817, 823 (1974)); <u>Brown v. Johnson</u>, 743 F.2d 408, 410 (6th Cir.

1984) ("'[M]aintaining security and preserving internal order and discipline are essential goals.")

(quoting <u>Bell v. Wolfish</u>, 441 U.S. 520, 546 (1979)).  Further, also as noted above, where "prison

administrators draw distinctions between" types of incoming mail "solely on the basis of their potential

implications for prison security," the practice is deemed to be "neutral". <u>Thornburgh</u>, 490 U.S. at 415-16.

Defendants argues there is a valid, rational connection between DOC Policy 450.100 and the goal

of protecting prison security.  The undersigned agrees.  Clearly, the purpose of DOC Policy 450.100, and

the regulations noted above giving the DOC Secretary authority to promulgate such a policy, specifically

concern the maintenance and preservation of the safety, security and order of DOC facilities through the

inspection of incoming inmate mail for potential threats thereto.  It is also clear that mail sent to inmates

written in foreign languages that cannot be understood pose such a potential threat.  Further, given that

the particular DOC mail policy at issue here distinguishes between permissible and impermissible mail

solely on the basis their potential security implications, that policy also is neutral.

The question then is whether defendants withheld plaintiff's mail pursuant to or in furtherance of

the above policy, or, as plaintiff asserts, merely used that policy as a pretext to prevent him from

receiving his mail in violation of his First Amendment rights.  Defendant Fleenor states as follows with

respect to his attempts to have plaintiff's mail translated:

> I remember working through the chain of command at WSP to find a DOC staff
> person who could translate in the Russian language.  I sent email to WSP staff and
> found only one person, a correctional officer, who thought he might be able to translate
> the letters written in Russian.  He received one letter, but he could not successfully
> translate it.  I received information that there was DOC staff elsewhere who could
> translate Russian, and I sent copies of the letters there.  This staff was unreliable and
> soon quit doing translations.  Next I attempted to work through a local church, and I
> found a Russian man who was willing to do the letter translation.  However, he
> expected to receive payment for this service, and at that time there was no funding
> available.  I was in the process of seeking funding to pay this person when Inmate
> Spitsyn was transferred to another facility.

(Dkt. #180-2, Exhibit 1, p. 2).  Other documentary evidence in the record regarding DOC staff efforts to

secure translation services appears to support defendant Fleenor's statements concerning his efforts. (<u>See</u>

Dkt. #180-2, Exhibit 2, Attachment A; Dkt #180-6, Exhibit 9, pp. 1, 6; Dkt. #182-3, Exhibit 2, Appendix

H-1, K-3, K-4, K-7, K-8, K-11).

1    Plaintiff argues defendants have provided no documentation that shows under whose authority

2    defendant Fleenor sought out a "free" translator, or that shows any of the other named defendants had

3    attempted to get funding to hire a translator. (Dkt. #182, p. 7).  With respect to plaintiff's first point, there

4    is no specific requirement that the DOC pay for the services of a translator.  Indeed, DOC Policy 450.100

5    merely requires that "reasonable efforts to have the mail interpreted" be made. (Dkt. #180-2, Attachment

6    A, Attachment 1 ("Unauthorized Mail") to DOC Policy 450.100, p. 1.  Given that the Supreme Court has

7    emphasized the importance of the allocation of prison resources in determining the effect accommodating

8    an asserted right will have on an institution, and the "substantial deference" accorded prison officials in

9    the implementation of a prison's policies and practices, the decision to first attempt to translate plaintiff's

10   mail without having to expend additional financial resources seems eminently reasonable. See Turner,

11   482 U.S. at 90; Brown, 743 F.2d at 410 (quoting Bell, 441 U.S. at 547-48).

12   The efforts made by defendant Fleenor themselves, furthermore, appear to be entirely reasonable.

13   First, he sought out a DOC staff person within his own facility.  When that did not work out, he then sent

14   plaintiff's letters to a DOC staff member at another DOC institution.  When that proved to be unreliable,

15   defendant Fleenor sought the help of an outside volunteer.  Because that individual sought payment, and

16   no funding at the time was available, defendant Fleenor proceeded to attempt to seek translator funding,

17   when plaintiff was transferred to another facility.  Plaintiff complains there is no evidence that any of the

18   other defendants attempted to get funding, but, as explained above, it was not unreasonable to first seek

19   DOC staff or volunteer translation services, and plaintiff has not shown earlier involvement by any of the

20   other defendants in the process, assuming such involvement on their part was even required, would have

21   produced different results.

22   In essence, plaintiff is attempting to create issues of fact here by pointing out the deficiencies he

23   perceives in defendants' attempts, or alleged lack thereof, to have his mail translated.  As discussed

24   above, however, plaintiff has not come forth with any evidence that defendant Fleenor did not conduct the

25   type of search for a translator he stated he conducted, that such efforts on his part were "incompetent"

26   rather than reasonable, or that any of the other named defendants were required to do or should have done

27   more than they did or did not do regarding this issue under the DOC's mail regulations and policy. (See

28   Dkt. #182, p. 10).  In other words, plaintiff seems to be merely replacing "conclusory allegations" in his

1    complaint with similar allegations contained in his response and own affidavit, which will not suffice to

2    defeat a summary judgment motion. Lujan v, 497 U.S. at 888.

3                    2.    The Second *Turner* Factor

4            As noted above, the second Turner factor "is whether there are alternate means of exercising the

5    [asserted constitutional] right that remain open to prison inmates." Turner, 482 U.S. at 90.  Where there

6    are "other avenues" that "remain available for the exercise of" that right, the Court "should be particularly

7    conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity"

8    of the challenged action. Id. (citations omitted).  Defendants argue the second Turner factor is met here,

9    because the withholding of plaintiff's mail did not deprive him of all means with which to communicate

10   with his mother and grandmother, noting he has not alleged any similar restriction on his ability to visit or

11   communicate by telephone with them, both of whom live in Washington.

12           Plaintiff admits in his response to defendants' motion that he did have other means with which to

13   communicate with his mother and grandmother, including visitation and talking on the telephone, but he

14   argues that the availability of these options invalidates any assertion that the withholding of mail written

15   in a foreign language implicates safety or security concerns.  None of the cases plaintiff cites to in support

16   of this assertion, however, so holds. See Kikumura v. Turner, 28 F.3d 592 (7th Cir. 1994); Thongvanh v.

17   Thalacker, 17 F.3d 256 (8th Cir. 1994); Ramos v. Lamm, 639 F.2d 559 (10th Cir. 1980).  Nor is a ban on

18   incoming mail written in a foreign language that cannot be translated on its face necessarily inconsistent

19   with allowing in person or telephonic conversations.  As noted above, for example, prison officials are

20   given "more leeway regarding incoming mail due to greater security risks inherent in materials coming

21   into a prison." Witherow, 468 F.Supp.2d at 1267  (citing Thornburgh, 490 U.S. at 413) (emphasis added).

22   The courts thus have concluded that incoming inmate mail presents unique institutional security concerns

23   that may not be present with other forms of communication.

24           As pointed out by defendants, furthermore, the three cases cited by plaintiff are distinguishable on

25   their facts.  In Kikumura, the Seventh Circuit held unconstitutional a "prison's alleged de facto policy of

26   summarily rejecting foreign language publications without making any effort to translate or screen such

27   material." 28 F.3d at 597-98.  Clearly, such is not the case here, as defendant Fleenor, as discussed above,

28   not only made efforts in this regard, but those efforts were reasonable.  In Thongvanh, the Eighth Circuit

found prison officials had failed to explain why a prisoner's correspondence, which was written in the Lao language, could not be sent outside to an entity that could provide a "cost-free" translation service, despite the existence of an English-only written communication policy, when there was evidence that several inmates who spoke German and Spanish had been excepted from that rule. 17 F.3d at 258-59. The Court of Appeals found the availability of this cost-free translation service to be a "ready alternative" to the English-only policy Id. at 259.  Here, however, as explained in further detail below, plaintiff has failed to show the existence of any such ready alternative.

Lastly, in Ramos the Tenth Circuit held invalid a prison policy of refusing to deliver inmate mail written in language other than English. 639 F.2d at 581.  There was no indication in that case, however, that the defendants there made the kind of efforts made in this case, discussed above, to have plaintiff's mail translated.  Accordingly, the undersigned finds that this case fails to support plaintiff's argument here as well, and that the second Turner factor has been met.

### 3.   The Third *Turner* Factor

The third factor concerns "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Turner, 482 U.S. at 90. Thus, when accommodation of that right "will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." Id.  It is unclear exactly what right plaintiff is asserting here he believes should have been accommodated. That is, is he claiming that he has a right to receive mail in a foreign language irrespective of the fact of whether they first have been translated or are understood by DOC personnel, or is he instead claiming that he has the right to have his mail translated by translators of his choosing?  In either case, plaintiff's claim fails the third Turner factor as well.

As discussed above, the DOC mail policy regarding mail written in a foreign language is designed to protect the security and order of the prison.  Also as discussed above, the facts before the Court show defendant Fleenor's actions were in furtherance of that policy's goals.  Plaintiff has not come forth with competent evidence to rebut that showing.  Further, there is no dispute that the goal of protecting prison security and order is a legitimate and neutral penological interest.  The undersigned also has found there is a valid, rational connection between the DOC mail policy's goals and defendants' actions.

1  Accordingly, allowing mail written in a foreign language without it first being translated or understood by
2  DOC staff unquestionably would have a significant adverse impact on prison security, or at the very least
3  pose a large potential threat thereto.

4        As to allowing plaintiff to have the right to choose his own translator, the undersigned finds this
5  accommodation poses too significant a potential burden on prison operations as well.  Plaintiff has
6  presented no evidence showing that the agency, which he claims is infested with Russian translators, to
7  the extent that such an agency actually exists, would have been able to provide translation services for
8  free or in a cost-effective manner – that is, in a manner that did not unduly burden prison resources.  Nor
9  is there any evidence that, were this form of accommodation to be granted, the prison's need to provide
10 such services to other prisoners would be limited in scope.  Indeed, plaintiff himself has indicated there
11 are other Russion-speaking inmates within the DOC system.  Further, the probability that there are other
12 prisoners in the DOC system who would require such services for any number of other foreign languages,
13 cannot be discounted.

14                          4.        The Fourth *Turner* Factor

15        Under the fourth factor, "the absence of ready alternatives is evidence of the reasonableness of"
16 the prison action.  Turner, 482 U.S. at 90.  On the other hand, "the existence of obvious easy alternatives
17 may be evidence that" the action "is not reasonable, but is an 'exaggerated response' to prison concerns."
18 Id.  Prison officials, however, need not "set up and then shoot down every conceivable alternative method
19 of accommodating the claimant's constitutional complaint" to satisfy this factor. Id. at 90-91.  In other
20 words, it "is not a 'least restrictive alternative' test." Id.  Nevertheless, if a prisoner "can point to an
21 alternative that fully accommodates" his or her "rights at *de minimis* cost to valid penological interests, a
22 court may consider that as evidence" that the prison action "does not satisfy the reasonable relationship
23 standard." Id. at 91.

24        Defendants argue plaintiff has not identified any ready alternative to the manner in which his mail
25 was handled.  The undersigned agrees.  As discussed above, allowing plaintiff to receive his mail without
26 it first being translated or understood by DOC staff would pose an unacceptable potential adverse impact
27 on prison security and order.  Also as discussed above, allowing plaintiff to use the translation service or
28 translator of his choosing regardless of cost, again would create the potential for an undue burden on the

REPORT AND RECOMMENDATION
Page - 11

1   use of prison resources.  As plaintiff has not identified any other ready alternative to the approach taken

2   by defendants here, and as the undersigned finds none plainly apparent, the fourth and final Turner factor

3   has been met, and plaintiff's First Amendment claim regarding his mail thus fails.

4           B.      Plaintiff's Due Process Claim

5           In addition to his First Amendment claim, plaintiff also alleges defendants violated his due

6   process rights under the Fourteenth Amendment by not responding or timely responding to or not fairly

7   reviewing the appeals and grievances he filed pursuant to the DOC's mail regulations and policy.  The

8   Due Process Clause of the Fourteenth Amendment provides that "no state shall 'deprive any person of

9   life, liberty, or property without due process of law.'" Toussaint v. McCarthy, 801 F.3d 1080, 1089 (9th

10  Cir. 1986). The due process guarantees of the Fourteenth Amendment thus "apply only when a

11  constitutionally protected liberty or property interest is at stake." Tellis v. Godinez, 5 F.3d 1314, 1316

12  (9th Cir. 1993).

13          A prisoner has "a Fourteenth Amendment liberty interest in 'uncensored communication by

14  letter,' although this interest is 'qualified of necessity by the circumstance of imprisonment.'" Witherow,

15  468 F.Supp.2d 1263 (quoting Martinez, 416 U.S. at 417-18); see also Krug v. Lutz, 329 F.3d 692, 696-97

16  (9th Cir. 2003) (inmate had liberty interest in receipt of subscription mailings sufficient to trigger

17  procedural due process guarantees).  Accordingly, that interest "is protected from arbitrary governmental

18  invasion." Martinez, 416 U.S. at 418.  The "'withhold[ing] delivery of [inmate mail]" thus "'must be

19  accompanied by minimum procedural safeguards.'" Sorrels v. McKee, 290 F.3d 965, 972 (9th Cir. 2002)

20  (quoting Martinez, 416 U.S. at 417-18).

21          The minimum procedural safeguards due under the Due Process Clause require at the outset that

22  the inmate receive "notice that his incoming mail is being withheld by prison authorities." Id.; see also

23  Frost v. Symington, 197 F.3d 348, 353 (9th Cir. 1999)); Martinez, 416 U.S. at 418 (requiring inmate to be

24  notified of rejection of letter addressed to him).  "[T]he right to appeal . . . to a prison official other than

25  the one who made the initial exclusion decision is equally necessary." Krug, 329 F.3d at 698; see also

26  Martinez, 416 U.S. at 418-19 (complaints must be referred to prison official other than person who

27  originally disapproved correspondence at issue).  The Ninth Circuit has found such "two-level review" to

28  be "inherent in minimum procedural due process," which thus must be provided by prison officials when

REPORT AND RECOMMENDATION
Page - 12

1    rejecting incoming inmate mail. <u>Krug</u>, 329 F.3d at 698 and n.6.

2        On the other hand, "[i]f a meaningful post-deprivation remedy exists for an alleged deprivation of

3    property," that post-deprivation remedy is deemed "sufficient to satisfy the requirements of due process."

4    <u>Sorrels</u>, 290 F.3d at 972 (discussing this principle in context of prison officials' refusal to deliver journal

5    to inmate).  In addition, "mere negligence on the part of prison officials is not actionable as a due process

6    violation under § 1983." <u>Id.</u>  Rather, to state a valid section 1983 claim, the claimed deprivation must be

7    alleged to have been "'caused by conduct pursuant to established state procedure, rather than random and

8    unauthorized action.'" <u>Id.</u> (quoting <u>Hudson v. Palmer</u>, 468 U.S. 517, 532 (1984)).  Only if such is the case

9    will post-deprivation remedies be found to not satisfy due process. <u>Id.</u>

10       Under this standard, plaintiff has failed to state a valid due process claim.  As discussed above,

11   plaintiff does not challenge in his complaint the constitutionality of the notice and post-deprivation

12   remedy provisions contained in the DOC's regulations and mail policy themselves.   Nor has he shown

13   defendants actions in withholding his mail were done <u>pursuant</u> to the DOC's regulations and mail policy.

14   Indeed, plaintiff specifically claims defendant Fleenor used the language of DOC Policy 450.100 as a

15   pretext for withholding his mail.  Plaintiff further specifically claims defendants Morgan, Scamahorn,

16   Littrell, and Lehman failed to respond to and/or review the appeals and grievances he filed in the manner

17   prescribed in that policy.  Accordingly, it appears plaintiff is complaining here of "unauthorized action"

18   on the part of defendants, which cannot form the basis of a due process claim.

19       In addition to the liberty interest in receipt of mail discussed above, states also "may under some

20   circumstances create liberty interests protected by the Due Process clause," but those interests "'will be

21   generally limited to freedom from restraint which . . . impose[s] atypical and significant hardship on the

22   inmate in relation to the ordinary incidents of prison life.'" <u>Witherow</u>, 468 F.Supp.2d at 1263-64 (quoting

23   <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995)).  In <u>Witherow</u>, as in this case, the constitutionality of the

24   prison mail regulations at issue were not challenged, but "the fact that prison officials did not follow the

25   procedures set out" therein. <u>Id.</u> at 1264.  The plaintiffs in <u>Witherow</u> argued that in promulgating the mail

26   regulations, the defendants were "obligated to comply with its mandatory provisions." <u>Id.</u>

27       In rejecting the plaintiffs' claim, the district court in <u>Witherow</u> observed that "prison regulations

28   are 'not designed to confer rights on inmates,' but are 'primarily designed to guide correctional officials

1  in the administration of a prison.'" <u>Id.</u> at 1265 (quoting <u>Sandin</u>, 515 U.S. at 481).  Indeed, the Ninth

2  Circuit has found there to be "no legitimate claim of entitlement to a grievance procedure." <u>Mann v.</u>

3  <u>Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988).  Thus, the undersigned finds, as did the court in <u>Witherow</u>,

4  that the DOC mail regulations and policy discussed above do not confer on plaintiff any particular

5  grievance procedure or appeal rights, namely the right to receive a certain response within a set amount of

6  time.

7          Because the DOC mail regulations and policy at issue here involve the inspection and withholding

8  of inmate mail, the undersigned also finds, as did the <u>Witherow</u> court, that they do "not contain any threat

9  of restraint that might 'exceed the sentence in such an unexpected manner as to give rise to protection by

10  the Due Process Clause of its own force.'" <u>Id.</u> at 1266 (quoting <u>Sandin</u>, 515 U.S. at 484).  As

11  "[c]ensorship and inspection of mail are certainly 'ordinary incidents of prison life,'" the undersigned also

12  agrees with defendants that their conduct in withholding plaintiff's mail did not impose an "atypical and

13  significant hardship" on him. <u>Id.</u>  Accordingly, the DOC's mail regulations and policy themselves did not

14  create a liberty interest, and plaintiff was "not owed any of the procedures" contained therein. <u>Id.</u>

15  III.     <u>The October 15, 2002 Incident</u>

16          Plaintiff alleges that on October 15, 2002, a WSP "Emergency Response Team used 3.5 fire-

17  extinguisher-size canisters of pepper gas on" him. (Dkt. #79, p. 3D).  He alleges he was placed in a cell

18  "without water while suffering from gas effects" – and thus was unable to wash the gas off – and then

19  "stripped naked." <u>Id.</u>  Plaintiff further alleges he "had to sleep naked on [a] bare concrete floor, while

20  suffering from cold temperature," due to the cell being air-conditioned, as well as from "gas burns." <u>Id.</u>

21  In addition, plaintiff alleges defendant Sheldon Weaver ordered that he be kept in that condition until

22  October 22, 2002. <u>Id.</u>  Plaintiff claims he was "excessively, cruelly and unusually punished" in violation

23  of his Eighth Amendment rights thereby.

24          The Eighth Amendment prohibits those "punishments which are incompatible with 'the evolving

25  standards of decency that mark the progress of a maturing society . . . or which involve the unnecessary

26  and wanton infliction of pain." <u>Estelle v. Gamble</u>, 429 U.S. 97, 102-03 (1976) (citations omitted).  To

27  state a claim under the Eighth Amendment, two requirements must be satisfied.  First, the deprivation

28  being alleged "must be, objectively, 'sufficiently serious.'" <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)

1   (citation omitted).  That is, the prison official's "act or omission must result in the denial of 'the minimum

2   civilized measure of life's necessities.'" Id.; see also Hudson v. McMillian, 503 U.S. 1, 9 (1992) (extreme

3   deprivations required).  Conversely, "the routine discomfort inherent in the prison setting is inadequate to

4   satisfy the objective" requirement. Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000); see also Hudson,

5   503 U.S. at 9 ("[R]outine discomfort is 'part of the penalty criminal offenders pay for their offenses

6   against society.'") (citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).

7        In addition to this "objective component," there is a subjective one. Keenan v. Hall, 83 F.3d 1083,

8   1089 (9th Cir. 1996).  The prison official thus also "must have a 'sufficiently culpable state of mind.'"

9   Farmer, 511 U.S. at 834 (citation omitted); Helling v. McKinney, 509 U.S. 25, 33 (1993) ("[A] claim that

10  a prisoner's confinement violate[s] the Eighth Amendment requires an inquiry into the prison officials'

11  state of mind.").  This state of mind "is one of 'deliberate indifference' to inmate health or safety."

12  Farmer, 511 U.S. at 834.  In other words, liability under the Eighth Amendment "requires 'more than

13  ordinary lack of due care for the prisoner's interests or safety.'" Id. at 835 (citation omitted).   An official,

14  therefore, will not be liable:

15        [U]nless the official knows of and disregards an excessive risk to inmate health or
          safety; the official must both be aware of facts from which the inference could be
16        drawn that a substantial risk of serious harms exists, and he must also draw the
          inference.
17

18  Id. at 837; see also Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).  A prison "official's failure to

19  alleviate a significant risk that he should have perceived but did not," therefore, cannot "be condemned as

    the infliction of punishment." Id. at 838.
20

21        As set forth above, plaintiff alleges he was subject to the use of "pepper gas," and subsequently

22  placed in a cell under conditions he claims constitute cruel and unusual punishment.  In regard to the use

23  of the pepper gas, plaintiff alleges this was authorized by Captain Munden, who once was, but is no

24  longer, a defendant in this case.  As such, the Court has no personal jurisdiction over him, and thus he

25  cannot be held liable for any of the claims set forth in plaintiff's complaint.  Nor does plaintiff name as

26  defendants in this action the members of the WSP Emergency Response Team, or allege that any of the

27  defendants he does name participated in the use of pepper gas on him.  Accordingly, to the extent plaintiff

28  is alleging a violation of his Eighth Amendment rights in connection with this specific event, he has failed

    to show any of the named defendants caused or personally participated in causing the harm alleged.  Any

1    such claim being made here, therefore, fails.

2         Plaintiff does allege, however, that defendant Weaver was the one who ordered him to be kept in

3    the conditions noted above he claims constitute cruel and unusual punishment.  Also as noted above, to

4    make out a conditions-of-confinement claim, plaintiff must show he was denied "'the minimal civilized

5    measure of life's necessities,'" resulting in "extreme deprivations." <u>Hudson</u>, 503 U.S. at 9 (quoting

6    <u>Rhodes</u>, 452 U.S. at 347).  He has failed to do so in this case.  Plaintiff alleges that after pepper gas was

7    used on him, he was placed in a cell without water to wash off the effects he was suffering therefrom.

8    Reports from the DOC officials involved in the incident, however, show that once plaintiff was extracted

9    from the cell where the incident occurred, he was "escorted to the . . . shower for decontamination,"

10   where he "was then rinsed off with cold water." (Dkt. #180-3, Exhibit 2, Attachment B, pp. 1, 3, 5-6, 12-

11   13).  Indeed, it appears that "copious amounts of water" were applied to plaintiff's hands, head and face at

12   his request.[2] <u>Id.</u> at p. 7.

13        With respect to plaintiff's allegation that he continued to suffer the effects of the pepper gas after

14   being placed in a cell, he has produced no evidence showing any short- or long-term harm.  "[T]he extent

15   of injury suffered by an inmate is one factor that may suggest" whether an Eighth Amendment violation

16   has occurred, and although the "absence of serious injury" does not necessarily end the inquiry, it

17   certainly is "relevant". <u>Hudson</u>, 503 U.S. at 7.  Here, plaintiff has not set forth any specific facts

18   establishing the extent of any injury he suffered, let alone a serious one, nor does the record contain

19   copies of any appeals or grievances filed regarding such injuries or requests for medical treatment

20   therefor.  A daily log report for plaintiff for the period of October 15, 2002, through October 22, 2002,

21   furthermore, fails to show any complaints in this regard as well. (<u>See</u> Dkt. #180-4, Exhibit 4, Attachment

22   A, pp. 2-5.  Indeed, on October 16, 2002, plaintiff reported "doing alright." (<u>Id.</u> at p. 3).

23        Plaintiff also fails to show that to the extent he was denied water during this period, such denial

24   constituted cruel and unusual punishment.  As discussed above, plaintiff was escorted to the shower for

25   decontamination soon after the incident involving use of the pepper gas ended, at which time "copious

26   amounts of water" were applied.  It does appear to be true that he was put on a water restriction after the

27

28        [2]Plaintiff claims that this and the other incident reports noted above are mere speculation on the part of the reporting DOC official, rather than first-hand knowledge, and therefore do not constitute admissible evidence.  It is quite clear, however, that these officials were directly involved in the incident in question, and thus did have first-hand knowledge of the events. (<u>Id.</u>, pp. 1-13).

incident, but this appears to be the result of his own actions that necessitated the use of pepper gas in the first place.[3]  (See Dkt. #180-3, Exhibit 2, Attachment B, pp. 1-15).  However, an entry on the daily report for plaintiff while in segregation shows he declined an offer of water made later that night.  (Id., Exhibit 4, Attachment A, p. 2).  Plaintiff again refused water offered the next day.  (Id.).

Plaintiff's water was turned on for ten minutes at 5:05 p.m. on October 16, 2002, and again for ten minutes at 8:10 p.m., after he already had refused water two other times earlier that day.  (Id. at pp. 2-3).  Water was turned on once more as well for ten minutes at 11:42 p.m. at his request.  (Id.).  It also appears plaintiff was provided water at least once for ten minutes on October 17, 2002, six times on October 18, 2002, and six times again on October 19, 2002, although he refused it one of those times, five times on October 20, 2002. (Id.).  While it appears plaintiff's water was turned on only once on October 21, 2002, he also was provided with a shower that day.  (Id.).  Plaintiff's water restriction was removed the following day.  (Id.).

"Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety."  Johnson, 217 F.3d at 731.  "The circumstances, nature, and duration of a deprivation of these necessities must be considered in determining whether a constitutional violation has occurred."  Id.  Further, "[t]he more basic the need, the shorter the time it can be withheld."  Id. (citation omitted).  Thus, "adequate water," as with other life necessities, is "an Eighth Amendment concern."  Minifield v. Butikofer, 298 F.Supp.2d 900, 904 (N.D.Cal.2004).  Accordingly, prison officials had a duty to ensure plaintiff with an adequate supply of water.

In light of the above evidence, plaintiff's claim that he was placed in a cell without any water has no merit.  Nor does the type of water restriction that was imposed on him, in which he was supplied with water several times a day on average, appear to constitute cruel and unusual punishment.  See id. (plaintiff failed to establish five-hour deprivation of water rose to level of Eighth Amendment violation); Dennis v.

---

[3]Plaintiff's actions seem to have consisted of refusing to return cleaning supplies that included a mop, broom and dust pan, which had been handed out to him. (Dkt. #180-3, Exhibit 2, Attachment B, p. 15).  Plaintiff also had "covered his cell front with paper, used his bedding, including his mattress, "to defeat the use of" the pepper gas – which apparently consisted of "O.C.", a gas aerosol – and "used his coveralls, shorts, underwear and towel to defeat" the pepper gas as well by tying his cell door closed. (Id.).  Plaintiff, furthermore, "had braided some sheets and had them hanging in the cell so as to deflect the" pepper gas "when it was administered." (Id.).  In addition, prior to the incident, in anticipation of his water being shut off, plaintiff had obtained "some large garbage bags . . . , two of which were filled with water," another of which "was protecting his property," and a fourth which he was using "to breathe in in an attempt to defeat the" pepper gas. (Id.).  Plaintiff also apparently had placed "parts of the broom and mop" in his cell "door to prevent it from opening." (Id., Attachment D, p. 1).

1  Thurman, 959 F.Supp. 1253, 1261-62 (C.D.Cal. 1997) (plaintiff failed to show that being without water

2  for 36 hour period violated Eighth Amendment, in part because of its short duration, and in part because

3  plaintiff was given liquids at every meal).  Even if it can be argued such a restriction meets the objective

4  requirement for stating a claim under the Eighth Amendment, plaintiff has not shown defendant Weaver

5  was deliberately indifferent to his health or safety.

6         Rather, as noted above, the water restriction appears to have been directly related to the actions

7  taken by plaintiff that resulted in the October 15, 2002 pepper gas incident.  Again, plaintiff was given

8  access to water several times a day on average, and even refused water on three such occasions.  He also

9  was allowed to shower during that period and after he had already been decontaminated.  No evidence has

10  been presented that this restriction was imposed for the purpose of inflicting harm on plaintiff's health or

11  safety, or in deliberate disregard thereto.  Instead, it seems to have been imposed to prevent injury and the

12  destruction of property, and to ensure staff and institution safety, and because of the threat plaintiff posed

13  to the orderly operation of his housing unit. (Dkt. #180-3, Exhibit 2, Attachment B, p. 15).

14         With respect to plaintiff's allegations that he was stripped naked and forced to sleep naked on a

15  bare concrete floor, here too those allegations are not supported by the facts.  As noted above, prison

16  officials do have a duty to provide prisoners with adequate clothing and shelter.  After decontamination

17  but before he was placed in his cell, plaintiff's clothes were "cut off" from him. (Id. at pp. 1, 3).  Given

18  that plaintiff had just been subjected to pepper gas, cutting off his clothes does not seem unreasonable,

19  and indeed likely would have been for the benefit of plaintiff's health and safety.  In addition, only a

20  couple of hours after the pepper gas incident began, and therefore much sooner after it ended, plaintiff

21  was offered both underwear and a T-shirt, which he refused. (Id., Exhibit 4, Attachment A, p. 2).  Thus, it

22  appears the fact that plaintiff may have remained naked was the result of his own choice.  Further, he was

23  observed the next day with a T-shirt, a sheet, a towel, and a pair of "[b]riefs". (Id.).

24         Given that plaintiff had at least some clothes and a sheet, his allegation that he was forced to sleep

25  naked also carries no weight.  Nor, to the extent plaintiff felt he had not been given enough clothing or

26  bed sheeting to sleep in, does it appear that he complained of any lack thereof.  In regard to plaintiff's

27  claim that he was forced to sleep on the bare concrete floor of his cell, defendant Weaver states that the

28  cell he was placed in had "a bunk," a statement plaintiff does not refute. (Id., Exhibit 4, p. 2).  Plaintiff,

1    furthermore, received a mattress on October 17, 2002. (Id., Exhibit 4, Attachment A, p. 3).

2            As such, this case does not involve a situation where plaintiff had "nowhere to sleep but the

3    floor." Thomas v. Baca, 514 F.Supp.2d 1201, 1216 (9th Cir. 2007) (requiring inmates to sleep on floor

4    deprives them of minimum measure of civilized treatment and access to life's necessities, because access

5    to bed is integral part of adequate shelter); see also Lareau v. Manson, 651 F.2d 96, 107-08 (2nd

6    Cir.1981) (same); Union County Jail Inmates v. Di Buono, 713 F.2d 984, 996, 1001 (3rd Cir.1983)

7    (providing inmates with bunk-type beds satisfies Eighth Amendment requirements of adequate shelter);

8    but see Mann v. Smith, 796 F.2d 79, 85 (5th Cir.1986) (no constitutional source for right to elevated bed;

9    Summers v. Sheahan, 883 F.Supp. 1163, 1169 (N.D.Ill. 1995) (same).  As with his claim alleging denial

10   of water, furthermore, plaintiff has failed to establish defendant Weaver acted with deliberate indifference

11   here, even if plaintiff did have to sleep on the floor for some period of time.

12           Plaintiff's last Eighth Amendment claim concerning this incident is that he suffered from the cold

13   temperature in his cell because it was air-conditioned.  In support of this claim, plaintiff states that in the

14   years 2002 through 2005, other inmates had filed grievances claiming the WSP's ventilation system was

15   inadequate. (Dkt. #182-3, Exhibit 2, Plaintiff's Affidavit, p. 6).  Plaintiff further states that in the building

16   where the October 15, 2002 incident occurred:

17           . . . In the month of July, while outside temperature may be in the 90's, temperature
             within a cell may also be in the 90's, while a cell next to it, may have a temperature in
18           the 70's.  Likewise, in a month of October, though heating may be on, one cell may
             have a temperature in the 90's, a cell next to it may be air conditioned in the
19           temperatures in the 60's.

20   (Id. at pp. 6-7).  Plaintiff further states that after October 15, 2002, the cell in which he was placed was air

21   conditioned. (Id. at p. 7).

22           Plaintiff's statements are contradicted by James M. Neuschwander, who is the third shift sergeant

23   for the Intensive Segregation Unit ("ISU") where plaintiff's unit and cell were located at the time and

24   who participated in the October 15, 2002 incident:

25           I am familiar with the ISU as I have worked in the ISU/IMU for approximately
             four years.  It is typically not cold in the ISU, however, if the cell temperature were to
26           drop below 70 degrees in the cell, the inmate would typically be issued an additional
             blanket.  Also, in October, it would not be typical to have the "air conditioning"
27           (meaning cooling) on due to the outside temperatures, instead the heat would have been
             on in the unit.  Inmates have complained about a lack of heat in the past in Units 1 and
28           4 of ISU.  Unit 1 has, in my experience, had more trouble maintaining a constant
             temperature if the weather is extremely hot (95 + degrees) or extremely cold (35-40

1    degrees or lower).  Unit 4 ISU (I/M [inmate] Spitsyn was placed into [cell] 4C9) does
     not typically have a problem with cell temperature dropping below 72 degrees
2    however, if the temperature is extreme, the only cells we typically have temperature
     problems with are cells 20 through 26.  To the best of my knowledge, the heating
3    system has not broken

4    (Dkt. #180-4, Exhibit 3, p. 3).

5          More specifically in response to the issue of the temperature in plaintiff's housing unit and cell

6    during the relevant time period, however, is the declaration of Douglas C. James, who has worked with

7    the Heating, Ventilation, and Air Conditioning ("HVAC") systems at the WSP for the past 16 years. (Dkt.

8    #183-2, Exhibit 1, p. 1).  Mr. James states that during the time he has worked at the WSP, the building

9    thermostats have been set "to achieve a temperature between 73 and 75 degrees," including the building

10   which housed the unit and cell in which plaintiff was placed after the October 15, 2002 incident. (Id. at p.

11   2).  He further states in relevant part:

12         When a staff person at WSP has a complaint about the heating, cooling or
           ventilation, they call in and the HVAC shop responds to the problem.  A search of our
13         computer data system for Unit 4 that includes [the cell plaintiff was placed in] for the
           month of October, 2002 revealed three call-ins with none from October 15, 2002
14         through October 22, 2002.  On October 1, the complaint was "turn off AC"; we
           investigated and repaired a seal in a pump, which then properly conditioned the air for
15         the heating season.  On October 2, staff informed us that grievances were being filed by
           inmates because Unit 4 was too hot; replacing the pump seal fixed this also.  On
16         October 8, staff of Unit 4 requested that we clean the air vents.

17   (Id., Exhibit 1, p. 2, Attachment A).

18         Plaintiff's allegations regarding cold temperature and the air conditioning being on from October

19   15, 2002, through October 22, 2002, notwithstanding, he has failed show any complaints concerning the

20   temperature in his housing unit or cell were made during that period.  That is, he has not shown that any

21   grievances or appeals were filed by him or other inmates on this issue at the time.  Indeed, the statements

22   provided by Mr. James reveal that no such complaints were made.  The daily report log kept for plaintiff

23   also fails to reveal he complained of the temperature in his cell, although he did at one point demand that

24   his water be turned on, and even stated at another point that he was "doing alright." (Dkt. #180-4, Exhibit

25   4, Attachment A, pp. 1-4).  Thus, his claims that he was suffering from, and had trouble sleeping because

26   of, cold temperatures are unsupported, and therefore difficult to believe.

27         Even assuming the temperature in his cell was cold for all of or at some point during the period of

28   time at issue here, that hardly suffices to meet the objective, "sufficiently serious" prong of the test for

REPORT AND RECOMMENDATION
Page - 20

1    stating a valid Eighth Amendment claim.  The Eighth Amendment guarantees prisoners adequate heating.

2    Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996).  In Keenan, however, the inmate "alleged only that

3    average temperatures in his cell 'tend[ed]' to be either 'well above' or 'well below' room temperature,"

4    which the Ninth Circuit found suggested "only that the temperature was not comfortable," and therefore

5    did not constitute a constitutional violation. Id.

6         As noted above, plaintiff merely claims here that the temperature was cold in his cell.  This claim

7    is thus far more similar to the one made by the prisoner in Keenan than it is to other claims the courts

8    have found could be sufficient under the Eighth Amendment.  See Gillespie v. Civiletti, 629 F.2d 637, 642

9    (9th Cir. 1980) (allegation that prisoner was placed in cell in which temperatures reached near freezing

10   during night could provide basis for Eighth Amendment claim); Fife v. Crist, 380 F.Supp. 901, 908

11   (D.Mont. 1974) (confinement to cell without any bedding in which temperatures were allowed to drop to

12   extremely uncomfortable levels while being completely naked for most of time might violate Eighth

13   Amendment).  Plaintiff also has not claimed, let alone set forth sufficient facts to show, that he suffered

14   any particular injury due to the allegedly cold temperature.  Again, while the absence of injury is not

15   conclusive here, it is relevant to determining whether the objective prong has been met.

16        Finally, as with his other Eighth Amendment claims relating to the October 15, 2002 incident,

17   plaintiff has failed to show defendant Weavor, or any of the other defendants named in his complaint, had

18   the requisite subjective state of mind.  That is, he has not set forth any facts to show that to the extent the

19   air conditioning was on from October 15, 2002, through October 22, 2002, thereby causing his cell to be

20   cold, this was due to defendants' deliberate indifference to his health and safety.  Rather, it seems that, as

21   Mr. James stated, at most it would have been due to problems with the HVAC system.  To the extent there

22   were such problems during the month of October 2002, furthermore, they all appear to have been quickly

23   attended to within reasonable periods of time after the complaints were made.  In addition, plaintiff has

24   not provided any evidence of complaints made by him or other inmates regarding the temperature during

25   the eight-day period of time at issue here, that would have put defendants on notice that there were any

26   problems, significant or otherwise, with the heating system.  Accordingly, plaintiff has failed to state any

27   valid Eighth Amendment claim here.

28   IV.    Plaintiff's Claims Regarding His Placement in Segregation

1   To state a claim for retaliation, an inmate "must allege both that the type of activity he engaged in

2   was protected under the First Amendment and that the state impermissibly infringed on his right to

3   engage in the protected activity." Rizzo v. Dawson, 778 F.2d 527, 531 (9th Cir. 1985).  The inmate "must

4   allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action

5   does not advance legitimate penological goals, such as preserving institutional order and discipline."

6   Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir. 1994).  Further, the courts "should be circumspect when

7   asked to intervene in the operation of state prisons," and "should 'afford appropriate deference and

8   flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct

9   alleged to be retaliatory." Pratt v. Rowland, 65 F.3d 802, 806-07 (9th Cir. 1995) (quoting Sandin, 515

10  U.S. at 482).  The inmate bears the burden of proving the absence of any legitimate correctional goals. Id.

11  at 806.

12      Plaintiff claims in his complaint that he was placed in "punitive" segregation by defendant

13  Morgan from November 17, 2004, until March 2005, and held there without cause, as part of a pattern or

14  practice of retaliation for commencing this civil action. (Dkt. #79, p. 3E).  Plaintiff further claims this

15  caused his law library access to be abridged, which, in turn, deprived him of his First Amendment right to

16  redress the government.  He also claims his being held in segregation without having been accused of

17  misbehaving violated his right to liberty without due process of law.  In addition, plaintiff claims

18  defendant Morgan had retaliated against him previously for filing grievances necessary for bringing this

19  lawsuit, by placing him in segregation for ten months, on the pretext that he had ended up in a group of

20  more than four inmates in violation of DOC policy on July 28, 2002.

21      Plaintiff meets the first requirement of establishing a valid First Amendment violation claim.  That

22  is, he has alleged that the type of activities he was engaged in, the filing of grievances and the filing of

23  this lawsuit, are protected under the First Amendment.  Prisoners have a constitutional right to access the

24  courts. Cornett v. Donovan, 51 F.3d 894, 897 (9th Cir. 1995).  They also have the right to petition the

25  government for redress of grievances. Cruz v. Beto, 405 U.S. 319, 321 (1972); Bradley v. Hall, 64 F.3d

26  1276, 1279 (9th Cir. 1995) (prison authorities may not penalize prisoners for exercising rights to petition

27  government for redress of grievances).  Plaintiff, however, has failed to establish that defendant Morgan

28  or any of the other named defendants retaliated against him for exercising such rights, or that any action

1   on the part of defendants did not advance any legitimate penological goals.

2       With respect to plaintiff's claim that he was wrongfully placed in segregation pursuant to the July

3   28, 2002 incident, evidence supplied by defendants indicates plaintiff had engaged in unauthorized group

4   meetings four times within a half hour period that day. (Dkt. #180-5, Exhibit 8, Attachment A, pp. 11-12).

5   That evidence, contained in plaintiff's "Legal Face Sheet," further indicates that at the time he was with a

6   known recruiter for a white supremacist group, and that they conducted meetings that had to be broken

7   up, as it was evident those meetings were to promote a white inmate agenda.  Plaintiff claims this was just

8   a "minor mishap," in which he accidently ended up in a group of more than four inmates, that required

9   him to receive no infraction. (Dkt. #79, p. 3E).  However, other than this general denial, plaintiff presents

10  no evidence to refute the accuracy of the notations contained in his Legal Face Sheet.

11      Nor is there any indication those notations were made by defendant Morgan or by other DOC staff

12  acting inappropriately on his behalf.  Rather, other documentary evidence in the record shows plaintiff

13  had been placed in administrative segregation for participating in security threat group, i.e., white

14  supremacist, activities on the basis of reports received by various DOC staff members. (Dkt. #57-17, pp.

15  4-8, Appendix K2-Appendix K5).  That evidence further reveals plaintiff initially was placed in

16  segregation by a DOC official other than defendant Morgan. (Id., Appendix K2, p. 4).  Nor is there any

17  indication that plaintiff's placement in segregation, or a subsequent recommendation from yet another

18  different DOC staff member that he remain in segregation, was at defendant Morgan's instigation or for

19  illegitimate reasons or reasons other than the fact that plaintiff had engaged in security threat group

20  activities. (Id.).

21      In light of the above evidence, the undersigned finds plaintiff has failed to show defendant

22  Morgan retaliated against his filing of grievances related to this lawsuit by placing him in segregation in

23  response to the July 28, 2002 incident.  Indeed, plaintiff has not set forth any facts showing defendant

24  Morgan was involved to any significant extent in placing or keeping him in segregation at this time.

25  Plaintiff also has not met his burden of showing his placement in such segregation did not advance a

26  legitimate penological goal, but rather was merely a pretext for retaliation.  As discussed above, the

27  protection of prison security and order is a valid penological interest.  Clearly, that interest was advanced

28  by plaintiff's placement in segregation for what appears to have been his involvement in security threat

1   group activities.  As such, he has failed to make a valid retaliation claim here.

2        As to plaintiff's claim that his placement in segregation on November 17, 2004, was in retaliation

3   for commencing this lawsuit, that claim too fails.  Documentation submitted by defendants indicates that

4   plaintiff was referred to administrative segregation for "protection" based on confidential information that

5   he "was the target of a planned assault," specifically "a stabbing." (Dkt. #180-5, Exhibit 6, Attachment

6   A).  However, because plaintiff believed at the time that the planned assault was "a fabrication," he stated

7   he "did not want protection." (Id.).  Plaintiff, therefore, was placed in involuntary administrative

8   segregation, even though no infraction had been written for him.  The above evidence, however, fails to

9   reveal any involvement on the part of defendant Morgan or any of the other named defendants in

10  plaintiff's initial or continued placement in such segregation. (See also id., Attachments B-H).

11       Plaintiff asserts defendants have failed to show they did not know of the grievances filed against

12  them or that he had filed this cause of action when he was placed in segregation on November 17, 2004.

13  However, plaintiff fails to understand that defendants have come forth with evidence that he was placed

14  in segregation for his protection by other DOC staff, and not by defendant Morgan and not for the

15  purpose of retaliating against him for filing grievances or this lawsuit.  Plaintiff's assertion, therefore,

16  unaccompanied as it is by reliable contrary documentation or evidence, is insufficient to overcome this

17  showing.  Further, the fact that plaintiff may have filed this lawsuit prior to being placed in segregation is

18  not itself evidence that defendants retaliated against him for filing it, without evidence that any of them

19  actually participated in placing him in segregation or did so for reasons other than that set forth above.

20       Again, therefore, the undersigned finds plaintiff has failed to show any of the named defendants

21  retaliated against his filing of grievances or this lawsuit by placing him in administrative segregation for

22  his protection on November 17, 2004.  As above, plaintiff has not set forth any facts showing defendants

23  were involved to any significant extent in placing or keeping him in such segregation.  Plaintiff also has

24  not met his burden of showing his placement in such segregation did not advance a legitimate penological

25  goal, but rather was merely a pretext for retaliation.  Once more, the protection of prison security, which

26  includes protecting the safety of inmates, and more specifically here that of plaintiff, is a valid

27  penological interest.  Clearly, that interest was advanced by plaintiff's placement in segregation due to the

28  threat of an attack on him.  As such, he has failed to make a valid retaliation claim here as well.

REPORT AND RECOMMENDATION
Page - 24

1         Plaintiff also claims his November 17, 2004 placement in protective administrative segregation

2    deprived him of liberty without due process of law.  Inmates, however, have no constitutionally protected

3    right to a particular classification status. Hernandez v. Johnston, 833 F.2d 1316, 1318 (9th Cir. 1987); see

4    also Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976) (no due process protections required with respect to

5    prisoner classification); Duffy v. Riveland, 98 F.3d 447, 457 (9th Cir. 1996) (prisoners have no

6    Fourteenth Amendment liberty interest in their classification status); May v. Baldwin, 109 F.3d 557, 565

7    (9th Cir. 1997) (prisoner has no liberty interest in freedom from state action taken within sentence

8    imposed, which includes being placed in administrative segregation).  Accordingly, plaintiff cannot state

9    a claim for relief under 42 U.S.C. § 1983 based on his change in classification status.

10   V.    Plaintiff's Claims Against Defendant Bermoy

11        Plaintiff claims that "[a]s part of an ongoing series of acts closely connected in time," defendant

12   Bermoy, on January 1, 2005, either allowed or caused another inmate to injure him, as part of "an act of

13   retaliation and/or punishment for litigation of this civil action." (Dkt. #79, p. 3F).  Specifically, plaintiff

14   asserts that while DOC policy demands that all inmates in protective custody be kept separate for safety

15   and security reasons, defendant Bermoy put him within "striking distance" of another inmate, by placing

16   them in the same "security cage." (Id.).  Plaintiff further asserts defendant Bermoy knew or should have

17   known he was breaching DOC's policy or "inciting a violent altercation" by doing so, thereby causing

18   him physical harm resulting in surgery. (Id.).  Plaintiff also claims defendant Bermoy failed to take

19   appropriate corrective action once the altercation began.  In addition to his retaliation claim, plaintiff

20   claims defendant Bermoy's actions violated his Eighth Amendment rights as well.

21        Defendants argue with respect to the retaliation claim that plaintiff has failed to show defendant

22   Bermoy knew he had filed this complaint prior to the January 1, 2005 incident.  Indeed, while plaintiff

23   first filed this lawsuit on March 11, 2004 (Dkt. #1), defendant Bermoy was not added as a defendant to

24   this case until May 10, 2006 (Dkt. #79), or more than 16 months after the incident at issue here.  There is

25   no evidence in the record that defendant Bermoy actually had any knowledge of this litigation prior to his

26   being named as a defendant in May 2006.  Without more, therefore, plaintiff has not shown defendant

27   Bermoy was aware of this case when the January 1, 2005 incident occurred.  Accordingly, plaintiff has

28   failed to show defendant retaliated against him for exercising his First Amendment or other constitutional

1    rights, namely his filing and litigation of this action.

2        As to plaintiff's Eighth Amendment claim, plaintiff has failed to show defendant Bermoy violated

3    his constitutional rights here as well.  The transcript of a telephone incident report of the January 1, 2005

4    incident from one DOC staff member describes the events that occurred that day as follows:

5        On 01/01/05 at approx. 0810 hrs. C/O Bermoy was in the process of running inside
         yard period for the I/M's housed on "B" tier in unit 4.  The tier is sectioned off in three
6        sections to allow yarding of three I/M's at a time.  I/M _____[4] cell (4-B-19) was
         opened and he entered the back section of the inside yard area.  Then I/M Spitsyn's
7        (#767137) cell (4-B-12) was opened and he entered the middle section of the inside
         yard area.  C/O Bermoy then intended to open cell 4-B-7, which is in the front section
8        of "B" tier.  C/O Bermoy inadvertently opened cell 4-B-17 which housed I/M _____.
         Cell 4-B-17 is in the middle section.  I/M _____ excited this cell and approached I/M
9        Spitsyn with his fists up.  C/O Bermoy ordered I/M _____ to lock-up over the
         intercom system.  I/M _____ ignored the orders.  I/M _____ then threw a punch
10       at I/M Spitsyn and both I/M's began throwing closed fist punches at one another.  C/O
         Cheshire observed the incident from the unit 4 control booth monitors and transmitted a
11       radio call of a fight in unit 4 on "B" tier.  Lt. Kershaw, unit and R&M officers
         responded to the unit / tier.  Due to the interlock system the fight was completed and
12       I/M _____ had entered his cell and the cell had been secured by the time staff
         arrived.  I/M Spitsyn was ordered to cuff-up by Sgt. Anderson.  I/M Spitsyn complied
13       with these orders.  R&M Officers Harris and Prock escorted I/M Spitsyn from unit 4 to
         the MI clinic and then to unit 4 holding cell without incident.  I/M Spitsyn was
14       evaluated and treated by RN Mason.  I/M Spitsyn's right hand was swollen over the
         fifth metacarpal with slight broken skin.  The area was cleaned and a ridged splint
15       applied.  I/M _____ was placed in restraints and escorted off the tier and placed in
         the unit 4 holding cell by C/O's Porter and Craig.  I/M _____ was then placed in
16       restraints by C/O Crump and escorted from unit 4 to the MI clinic by C/O's Crump and
         Zipt in a wheel chair.  I/M _____ was evaluated and treated by RN Rock, J.  I/M
17       _____ presented with multiple contusions to his head, bloody nose, a laceration
         along outer right eye and a laceration to his left elbow.  I/M _____ was disoriented at
18       the time of the evaluation.  Due to I/M _____ injuries he was taken to Saint Mary
         medical center for further evaluation at 0848 hours.  I/m [sic] _____ arrived back at
19       the institution at 1050 hours and placed in unit 1 "C" tier cell 24.  I/M Spitsyn was
         placed in cell 4A20.  After the cleaning of unit 4 "B" tier I/M _____ was placed back
20       in his assigned cell.

21   (Dkt. #180-3, Exhibit 1, Attachment E, p. 3).  Other incident reports from additional DOC staff involved

22   in this incident support the above version of events.  (Id., Attachment E; Dkt. #180-5, Exhibit 7).

23       Plaintiff has presented no reliable evidence to dispute the DOC staff description of the incident set

24   forth above.  Given that description, the undersigned finds plaintiff has met the first prong for stating an

25   Eighth Amendment violation claim.  That is, he has shown the deprivation being alleged constituted an

26   "objectively, 'sufficiently serious'" one, in that he was "incarcerated under conditions posing a substantial

27   risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citation omitted) (setting forth

28

     ─────────────────────
        [4]The name of the inmate here was redacted on the copy of the incident report submitted to the Court.

1   standard for claims based on failure to prevent harm).  Plaintiff, however, has failed to meet the second,

2   subjective prong, because he has not shown defendant Bermoy was deliberately indifferent to his health

3   and safety in acting, or failing to act as the case may be, as he did.

4          To meet the subjective Eighth Amendment deliberate indifference prong, plaintiff must establish

5   defendant Bermoy disregarded an excessive risk to his health or safety.  Here, plaintiff asserts defendant

6   Bermoy intended to cause him harm.  But nothing in the above description of the events that occurred on

7   January 1, 2005, reveals any such intent on defendant Bermoy's part.  Rather, at most, it appears that the

8   opening of the cells as occurred was an inadvertent mistake.  Plaintiff further asserts defendant Bermoy

9   did not "declare an emergency code over the radio" and summon "back up," but instead allowed the fight

10  to continue in violation of a DOC procedures and training. (Dkt. #79, 3G).

11         Plaintiff, however, has not produced any evidence of the DOC emergency procedures and training

12  he claims were violated by defendant Bermoy.  Nor does it seem defendant Bermoy intentionally allowed

13  the fight to continue with the purpose of harming plaintiff.  Rather, defendant Bermoy responded to the

14  fight by first telling the inmates to "lock- up."  When the two inmates did not comply, another DOC staff

15  member who also observed the fight "transmitted a radio call" of the fight, which caused other DOC staff

16  members to respond.  Thus, while defendant Bermoy himself may not have called for back up, it appears

17  another DOC staff member quickly did so.  There is no indication that defendant Bermoy was deliberately

18  indifferent to plaintiff's health and safety by not first doing so, or even that he would have been able to do

19  so more quickly than the DOC staff member who did make the call.  Finally, while the fight did continue

20  to its end before it could be stopped, this appears to be because of the nature of the prison unit's

21  "interlock system," not because of a lack of diligence by defendant Bermoy.

22  VI.    Qualified Immunity

23         Under the doctrine of qualified immunity, state officials "performing discretionary functions [are

24  protected] from liability for civil damages insofar as their conduct does not violate clearly established

25  statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald,

26  457 U.S. 800, 818 (1982); Somers v. Thurman, 109 F.3d 614, 617 (9th Cir. 1997).  Prior to determining

27  whether defendants are entitled to qualified immunity, however, the Court must first determine if plaintiff

28  "has alleged the deprivation of an actual constitutional right at all." Conn v. Gabbert, 526 U.S. 286, 290

(1999).  If not, the issue of qualified immunity does not come before the Court.  <u>Id.</u> at 293.  When making this initial determination, the Court must view the facts "in the light most favorable to the party asserting the injury."  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

Defendants argue in their reply to plaintiff's response to their motion for summary judgment that they are entitled to qualified immunity.  Defendants, however, did not raise this issue in their summary judgment motion.  Therefore, the undersigned is not inclined to address it here.  Nevertheless, given that, as discussed above, plaintiff has failed to alleged an actual deprivation of his constitutional rights with respect to any of the above claims, the issue of qualified immunity does not come before the Court.  This, then, is another reason why this issue need not be reached here.  Accordingly, the undersigned declines to decide whether defendants are entitled to qualified immunity in this case.

CONCLUSION

Defendants have met their burden of demonstrating that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.  Plaintiff has failed in all instances to allege facts sufficient to form a constitutional violation.  Accordingly, the undersigned recommends the Court GRANT defendants' motion for summary judgment. (Dkt. #180).  The undersigned further recommends all other pending motions currently before the Court, including defendants' motion for extension of time to file joint pretrial statement (Dkt. #186), be dismissed.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedures, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto.  <u>See also</u> Fed.R.Civ.P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **February 22, 2008**, as noted in the caption.

DATED this 28th day of January, 2008.

Karen L. Strombom
United States Magistrate Judge